Good morning, Your Honors. May it please the Court, Wade Malone on behalf of Appellant Atlantic Cancer Care. I'm here today with Lee Wall. Atlantic Cancer Care requests that this Court reverse Judge Reel's decision granting Amgen's 12B6 motion to dismiss. The Court's standard review in this case is de novo. Your Honors, Appellee Amgen asked this Court to has not been established anywhere to my knowledge, and that is, the parties can operate under an original contract, that contract expires, but the parties subsequently have a dispute regarding performance under that original contract. Under Amgen's theory, one party can then resolve that dispute under the original contract by imposing a remedy under later contracts even though such contracts provide for no such remedies. That is what happened here. Let me see if I understand this right. You've got these tiers, and in order to get into Tier 7 when they bought the medicine, they have to sell or they have to buy more than $1.4 million worth of it. Is that right? Your Honor, that was part of it. There were three drugs that needed to be purchased, and that was certainly part of it. Okay. Now, they're allowed to return. A seller can have a no return policy or a return policy. This seller had a return policy. There is no return policy stated in the contract, Your Honor. But they were allowed to return? Your Honor, there's no evidence of that in the record. There was. Oh, I thought they returned drugs and credit. They returned $37,000. And did they get credit? $37,000 subtracted from that? That is not in the record, Your Honor. The only thing that is in the record is that Amgen took rebates back of $184,000 under later contracts. Do we know what the reason was for the return? Was it a shelf life expiration date? To my knowledge, Your Honor, it was not a shelf life. It was just they had no longer any need for it. And I want to address an issue up front of gamesmanship. The defendant accuses Atlanta Cancer Care of gamesmanship despite the fact of the long-term contractual relationship with the parties. If Atlanta Cancer Care was engaging in gamesmanship, it was the worst effort in history. Because who in their right mind would return $37,000 worth of product if you're going to lose $184,000 in rebates? No one in their right mind would do that. But none of the contracts at issue here. Is that what happened here? That is exactly what happened. They returned how much product? $37,000, which was 2% of the original amount purchased in the third quarter of 2005. And they lost $184,000? They lost $184,000 in rebates, Your Honor, under subsequent contracts. The original purchases under the 2004 contract That's because when Amgen applied it to, so that means Amgen credited the return, but applied it against the year in which they bought the product, so they fell into a lower tier. Is that the way it worked? Your Honor, the record is not clear on the crediting at all. The only thing in the record is... Is it clear on the tier? They met the tier in what is it, 13.5% instead of 25% or something like that? Something like that, Your Honor. But how Amgen calculated the $184,000 is not in the record. That is a figure they gave to Atlanta Cancer Care, and that is a bone of contention in this case, how that number was arrived at. Again... Yes, Your Honor. Well, I was trying to think. Using the 13.5% and the 25% rebate figures, you should have been able to determine what the difference would have been in the third quarter of 2005 from the $37,000 return, right? Correct. And what does that work out to? I don't have that math in front of me, Your Honor. I'm sorry. But again, 2% of... You just apply the percentages, don't you? You do apply the percentages. And that, again, assuming... And what was the total product purchased? $2,070,000 was purchased in the third quarter of 2005. At 25%, and then you subtract $37,000 and multiply it by 13.5% and subtract the difference between the two. I believe that is correct. That's why I went to law school. I was going to say, Your Honor, I was terrible at math. I took one course at Georgetown and I said, never again. I'm happy my kids are better at math than I am. Go ahead. But fast forward. And so the purchase was made in 2005. 2% was returned roughly a year later, 2006. The first contract had expired, and then Amgen started taking... It looks about right. They go... If they bought less than the $2,000,000... If they didn't buy enough to stay at that level, and then their rebate drops from somewhere around the neighborhood of a half million to somewhere around the neighborhood of a quarter of a million. Yes, Your Honor. Roughing it out. Roughing it out. I think that would be correct. But... Surely, there's been some roughing out in counsel... Certainly. Absolutely, Your Honor. The focus has been on the legal issue, because how... No one cares about the money. Well, we obviously wanted to know the amount that they had withheld, although they never gave us an explanation for that. They did it in six quarters, in which later contracts were in effect. Under all of the contracts, Amgen has the unfettered right to amend or re-amend any of the contracts that had ever occurred here. And so the first contract expired, then they went about, after the product was returned, in good faith again, if that was gamesmanship, it was a poor effort, and went about taking back rebates under the other contracts in which performance had occurred under the other contracts. They were under no obligation under their contract to accept returns in this case. Yes, Your Honor. Well, look, it seemed kind of intuitive to me that if your rebates are under an earlier contract, then that's how you measure what the rebate is. And if you're allowed to make some returns, you figure out what your original purchase minus returns would generate as rebates under the original contract. Your argument, if I understand it right, is no, you don't do that. You calculate the rebate under the original contract, and you figure out what effect the return has under the contract in effect at the time of the return. That's their position. Okay. That is their position, Your Honor. Our position is when they were under no obligation to accept the return, but if they were going to accept the return, it needed to be offset on the quarter it was returned. That's what the contract says. But again, they were under no obligation to take it back, and to the extent they were going to I think that's what I meant to say. I must have misspoken. I'm sorry if I misunderstood you. I probably misspoke. Show me what words to look at in the excerpts that support your theory. Your Honor, I need to expand my theory just one second to get you to where my argument is going. Under each of these portfolio rebate agreements, the rebates are calculated, earned, vested, and paid on a quarterly basis. And that is in each of the contracts. And there's a payment investing provision that says, Amgen portfolio rebates shall be paid in accordance with the payment provision set forth in the provision titled Payment Terms of the Agreement, and shall vest at the end of each applicable quarterly measurement period. And so that is the contract administration. Purchases are made in a quarter, books are reconciled, and then rebate is paid the next quarter. Each contract has a definite term. There were three contracts at issue here. It's our contention that Amgen has breached all three of them, but in particular, the 2006 and 2007, again, because they had no right to recalculate, claw back, look back on the rebate apportionment that they did. I'm still not getting something. Let me give you a hypo, and you help me with it. I buy a new lens for my camera, a fancy German lens. It costs $5,000, and I've got a 10-day return privilege. The dollar is crashing against the euro. During that 10 days, the price of the lens goes up from $5,000 to $6,000. I exercise my return privilege. I don't get $6,000 when I return the lens, even though that's not what it's worth. I get $5,000, because the return just means it's as though I didn't buy it when I bought it, and it was only $5,000 then. I would agree with what you just said. You only get $5,000 back. Why doesn't the same thing apply to the doctors on the medicine? Because we have different contracts at issue here. There is no obligation for them to accept the return. They cannot enforce a remedy under a later contract that they didn't have in the first contract and don't have in the later contracts. That's the simplicity of our argument, Your Honor. It's different than what you just described. I have to admit, I'm totally confused. Why don't you just say the same thing again? If you say it in different words, we may get it. Okay. Under your facts, you went and bought a lens, you had 10 days to return it. The price went up in that period from $5,000 to $6,000, and you go in and you say you want $6,000. But you paid $5,000, and that's what you're entitled to get back under the terms of your purchase. Here, Atlanta Cancer Care, in the third quarter of 2005, qualified for the highest tier rebate, and they paid roughly $2.1 million. A year later, not meeting the $37,000, the 2% of the medication, they returned it. The original contract had expired. There's no evidence in the record of gamesmanship, bad faith, getting out of the relationship, trying to make a fast one. And then Amgen, under the 2006 contract, which was then enforced, took $184,000 of rebates back under the 2004-2005 agreement, and they had no right to do that. To the extent they had a beef, they needed to make a claim under that 2004-2005. Either we're not taking that product back because that contract's expired, or number two, if you do take it back, we're going to go back under that original agreement and recalculate your rebate agreement. Which is basically what they did. That's exactly what they did, and there's no authority. Now they're offsetting it. They're offsetting it, Your Honor, and we don't, again, know how they came up with that figure. Again, we returned $37,000 and they're taking $184,000 back. You don't disagree that had your client returned the $37,000 in the third quarter of 2005, the rebate would have been reduced because they would have dropped back down to tier three and they would only have been paid it. I absolutely agree with that. Okay. Why would they ever return it then? Because the drop in the rebate... They wouldn't. Hmm? to recalculate that rebate a year later, two years later. But clearly the parties contemplated that there would be returns because the rebate is calculated on the net purchase in the quarter, right? Net purchase in the quarter, but again, you've got to read that in companion with the quarterly measurement period, which is quarterly. No, no, I understand that, but you seem to, you were saying Amgen had no obligation to take product back and yet the contract clearly contemplates that there would be returns. After the contract had expired, there's no obligation and I would, there is a reference to less credit and returns, but there is not an affirmative obligation for them to take product back. Could you just explain, what did the new contract do that changed the incentives, if any? The incentives changed somewhat, the percentages changed somewhat. But didn't the clauses remain the same in terms of... The quarterly measurement period was the same. And net purchases? Net purchase was defined the same. Including returns? Right. So the course of dealing between the parties never changed in terms of buying product, returning product, buying more product? The only issue that there, where there was a return was on this $37,000. Okay. And you can trace this $37,000 lot to the drug that was sold in the third quarter? That is in our complaint. So you would read this phrase in the contract, less credits and returns, to mean less credits and returns made during this contract period? In that quarter, yes, Your Honor. Or only less credits and returns made during that quarter? That is correct, Your Honor. So... We think that is consistent with the quarterly measurement period language where the rebate best during that period. So if they bought, I don't know if they're on calendar year or what, but imagine they're on a calendar year and they buy enough to get into a high tier in the third quarter and then they return it during the first week of the fourth quarter, that return does not reduce their tier. It would do it for the fourth quarter, Your Honor. I'm sorry, I had to think. It would be adjusted to their purchases in the fourth quarter. That's how the contract reads. Wait a second. So you're now saying that there would be a credit against purchases in the new quarter? If they returned it in the fourth, if they bought it in the third quarter, returned it in the fourth quarter, the contract is still operative, there would be a credit and a reduction on purchases in that quarter. Your Honor, I see I have roughly a minute left. I do want to... No. The red light means that you're a minute over. Oh, I'm sorry. Thank you, Counsel. Good morning, Your Honors. May it please the Court, William Diaz on behalf of the Appellee Amgen, Inc. Your Honor, Amgen's position is that ACC purchased the product, there's no dispute in the record about that, that it met the high tier level, tier 7, that Amgen subsequently and very quickly thereafter paid the rebate due because of those purchases. Could you tell us what the arithmetic is on the calculation? What gets subtracted and multiplied by what? Yes. What happens, Your Honor, is that the contract is kind of a family product contract for Amgen, so it has three products, but there is a, what's called an Araness gate, is how Amgen would call it. I think we all understand. There's white blood stuff and red blood stuff for people. We got that. We don't need to know. No, no. And so what happens is that they had met the minimum Araness purchases that allowed them to move beyond tier 3, but as soon as they returned the $37,000, they dropped below that and that caused them to drop below tier 3, and that's why the return to $37,000 amounted to over $180,000. That last step is where it would be nice if you just read off the numbers to us, how that calculation is made, because what they're saying is $184,000. We don't understand. Where did that come from? We returned $37,000 worth of product and it cost us $184,000. We don't know the arithmetic. Right. Well, you have to have, they provide some of the details in their complaint. Why didn't you just tell us? You couldn't calculate it just based on the complaint. Why didn't you just tell us how this happened? Oh, sure. That's what I was getting to, that once they returned $37,000 in 2006, that reduced their level of Araness purchases before the tier 3 level. That prevented them from reaching tier 7. I know the general theory. I'm asking for the calculation. The calculation you would not be able to do based solely on the complaint. Why not? Why wouldn't you do it the way I suggested to opposing counsel? Because, Your Honors, the information they provide in the complaint would not tell you all the information that you need to know for that offset. We've got the contracts attached to the complaint. We do have the contracts, but you would need to know specifically how much they purchased of Neupogen and Neulasta and Araness of all three, which they do not provide in their complaint. There's something really absurd here, and I'm just slow. But if you're right, they should have just thrown away this stuff. Yeah, let me address that. It's a very good point. Counsel mentioned that they just didn't need the product, and so they returned it. They're an oncology clinic. This is an absolutely essential product they cannot do without. They have to have it. There are only two of these products out in the market. They just went to the competitive product. The need never went away. Any chemotherapy patient has the risk of getting anemia and will need this product. So your competitor, not in the record, but we presume they got a better deal from the competitor and that's why they wanted to return the product. Presumably, exactly. And so they purchased the product. That's what allowed them. That's what met the condition precedent. They then returned it. Amgen has to. It knows when those products were purchased from. It needs to account in its record keeping for that purpose. If you applied the returns in the quarter in which they were made, as they suggest, there are a number of reasons I can give you why that wouldn't work. First of all, I'll tell you that they had no purchases of Aranesp in that quarter, so there'd be nothing to offset it against. So the impact on them would be zero. So you wouldn't have permitted them to offset in the first quarter of 2006, or I guess it was 2005, you wouldn't have permitted them, no I'm sorry, when it was returned in 2006 and there were no purchases of that particular product, you wouldn't have allowed them to simply credit $37,000 against all their other purchases from Amgen. No, because they had continued to buy the other products and were entitled to those discounts. So does the rebate vary for each drug? It does. Different percentage? It does. Depending on volume? That's correct. The other reason is that these drugs are highly regulated, Your Honor, by Medicare and there are price reporting obligations and Amgen has to report them in the quarter in which they were purchased and it has to be a net price. That's how reimbursement is determined by Medicare. So it couldn't do it any other way. Has your, based on your client's subsequent conduct, you have not paid them $184,000 because they returned $37,000 worth of product? That's what the complaint alleged. That's exactly right. What happens is that when you reach a certain level of Aronesp and you become a more favored customer, it allows Amgen to provide a significant level of rebates. And those customers that don't reach that don't get anywhere near that level of rebates. When they return the product, they drop below that minimum purchase level and that drops them significantly. So why shouldn't they have just left it in their storage room instead of returning it? I assume the regulation would have some limits on throwing it in the trash can. Well, Your Honor, they could have used it on patients. Like I said, this is an essential product that they need. They didn't need to buy the competitive product until they ran out, if that was the case. They could have used it. Your interpretation is right that getting a $37,000 return credit costs you $184,000 minus the $37,000. If that's the right interpretation of the contract, why wouldn't they just hold on to it? Your Honor, there's no way that Amgen could know why they didn't hold on to it as opposed to returning it. I'm not asking about why they did, in fact. I'm asking about why that would be a reasonable interpretation of the contract. I'm sorry. Could you ask your question? Why would it be a reasonable interpretation of the contract if they returned $37,000? When you read a contract, you try to make sense of it. In trying to make sense of it, you try to figure out what would be to avoid an interpretation that would be utterly absurd, that nobody in his right mind would agree to. You interpret it to be something that people in their right minds might agree to. So I'm asking why people in their right minds would agree to a contract with the interpretation you attribute to it. Well, I think, Your Honor, because it's not surprising to me because of the interpretation they read to the contract. They believe that once the payment is made and they cash it, it vests, and anything they do after doesn't affect the rebate they receive. So they could have returned all of the product the day after they received the rebate check and zero impact on them in terms of that rebate check. That's their view of the contract. So based on that view, it's not a surprise that they took the action they did. They were going with a competitive product, they didn't need that product anymore, give it back because the distributor will, of course, accept it. So their mistake was not just using up what they had in the storage room or in the thing and just forgetting about it and then break with you. Right, because that was, they had to meet a certain level of purchases to get that rebate. If they didn't need that product, then why would they buy that level to achieve the highest level of rebates, which you don't want in a situation where someone buys more than they actually need. Yeah, the numbers work out. The incentives. But like I said, this is an essential product, it needs to be in their clinics, there's no way around it. It's not a nice to have product, it's a must have. So neither side can tell us where any of these numbers come from. Your Honor, there would have to be more jurisdictions. Your interpretation is very troublesome because, well, it kind of reminds me of these people trying to sell houses by offering free sports cars. You get your sports car and then say, no, I don't think I'll close on a house. But your interpretation is incomprehensible to me. Well, the interpretation. Less than when I started. Sure, if I may, Your Honor. There's a condition present in the contract to reach those Tier 7 rebates, okay? That condition has to be met, period. Whether it appears initially to be met, okay, but then they engage in a return that lowers their purchases, then that condition was not met with respect to those Tier 7 rebates. But the condition precedent is you got to buy enough of the stuff to get into the volume tier. Exactly. Not the dollar volume of purchases. Correct. Yeah. And once they made those returns, they no longer had met that condition precedent. Right. But that still doesn't answer the question of then what do we do with the offset? That's a separate issue, and I'm happy to address that, but in terms of whether they have the right to enforce the contract under the law, they have to fulfill all of their obligations. I understand that. I guess I'm still wrestling with why it was permissible for Judge Real to simply say, well, this is crystal clear to me, you're out of here. It's not crystal clear to me. In terms of the offset process, if you will, Your Honor, these companies are engaged in a business relationship and a privative contract. They have a situation where payment flows both ways, for the purchase of the product and for the rebates. Once the returns were made, that created a balance due at Amgen, and Amgen withheld that from the subsequent rebates that were earned, or at least that are not challenged being earned under the law. And on what authority did Amgen do that in the contract, in the subsequent contract? No, it was not under a subsequent contract. It was under the contracts that was at issue when the purchases were made in the third quarter of 2005. But I thought that contract had expired by the time that the product was returned. Correct. There were subsequent contracts after that. But the purchases and the rebate that was paid because of that was based on that older contract. And so that was where the breach occurred, is on the older contract. No, no, I understand that. But by what authority does Amgen then offset the amount that it thinks it overpaid to ACC on subsequent purchases under different contracts in the future? There's no provision in the contract that speaks to what happens when the return is made in a subsequent quarter. That's correct. That's the problem we have here. That's correct. But the fact remains that a condition continues to be a condition. And when it is not met, it is not met. And the fact that it later appears to not have been met does not change that. I'm not sure that what you just said fits the documents I've got here in the excerpts of record. What it looks like is there is no subsequent separate contract. What there is is a letter dated November 24, 2004, that says, Ray, amendment to the Amgen Portfolio Rebate Program letter agreement. And then what it says in it is that the letter agreement with respect to eligibility for the volumes here shall be amended in accordance with the terms stated herein. So I think what they're saying is there aren't that since there's an amendment, you just apply the amended terms to the time that is covered by this letter. That's correct. The contract just continually is amended primarily because... Why wouldn't you? How do we find the words that say, don't do that, apply the terms in the original and not the amended to your schedule? All the amended contracts say that the terms of the prior agreement are in effect, other than for the amendments that are mentioned specifically in the amendment. So you finish the sentence, it was changed primarily because? Primarily because of the financial, to understand the level of purchases that a clinic would need to make. That would change from time to time. Could you guide me to the right words in this letter? It's several pages, single space, three pages, single space. Guide me to the words that support your interpretation. Sure. For instance, your honor, if you look at supplement access to the record, page four, that's the original agreement. Okay. And then if you look at page 11 of the supplemental excerpts of record, this is the amendment to the Amgen Portfolio Letter Agreement. Well, I think the amendment letter starts on page nine of the excerpts. Am I looking at the right thing? And the supplemental excerpts of record? Let's see, supplemental excerpts of record. It starts, it says exhibit... Exhibit B, page nine. It says in the lower right corner. Oh, there's several numbers. So you're right. On the bottom right, it says nine. The 11 was meant for the actual record. Assuming that's what we've been talking about when we talked about the subsequent agreement, could you point us to the words that support your interpretation? It supports the interpretation that this is an amendment and that the prior contract terms govern or... Look, I'm not playing games with you. No, I'm not either. I'm trying to understand your question so that I can answer it precisely. Your interpretation is that even though it amends the volume tiers, that nevertheless you apply the original volume tiers provisions and not the amended volume tiers provisions to returns of product purchased in the earlier contract period and returned in the later contract period. Now, what I want is the words in exhibit B that starts at page nine of your supplemental excerpts that support your interpretation of the contract. Sure. There's nothing in here that will say returns made in a period after the quarter in which the rebate is paid can be then used to determine what the rebate amount should have actually been. Do we have an ambiguity that we have to go... that Judge Reel shouldn't have thrown in there? No, Your Honor, because the issue that we raised on the motion to dismiss and that we raised in our brief here is whether ACC has the right to enforce the contract if they have not fulfilled their obligations under the contract. And the condition precedent is what you have to look at. And that's what they did not meet by subsequently returning product to you later. The condition precedent was met in the third quarter of 2005 when they purchased that volume of the drug, wasn't it? It appeared to have been met, and Amgen certainly paid based on that, but if you didn't return the day after the rebate check comes, have you really met your condition precedent? But to follow up on Judge Kleinfeld's question, where do I look in order to find out what Amgen's remedy is when that happens? And you're telling me there's nothing in the agreement that talks about that. I think every agreement has to have a... it has to be read with a commercially reasonable perspective. And it would be... it would just be commercially unreasonable to expect that if you went to purchase a product at the mall, sent in your information to get the rebate check, and then returned the product that kept the rebate check. So the answer to my question is now out there. There are no words in the agreement, but it's the only reasonable interpretation, taking the two agreements together. I think that's your answer, isn't it? It is, and the only thing to add would be that there's a condition that exists, and the fact that it initially appears has been met does not change the fact that it was not in fact met. What condition now precisely was not met? The purchase level, the $2 million plus that ACC had met, allowed it to reach Tier 7 of the contract. When it returned the product, it reduced it by $40,000, and that dropped it into Tier 3. So it was no longer eligible for those Tier 7... Tier 4 through 7 rebates that it received. Well, if that's the case, does it not require the introduction of extrinsic evidence in order to establish commercial reasonableness for why Amgen has offset $184,000 against ACC? I don't believe so, Your Honor, because the question of contract interpretation is a legal question, and the Court properly determined in our view that the contract here wasn't ambiguous, that it dealt with less credits and returns as we had argued, and he can make that determination as a legal matter. But under the effect of Judge Reel's ruling is to say, ACC, you're out of court because you have failed to state a claim for breach of any contract. And I don't see how you get there. There is clearly a dispute between the parties over monies owed under the contract. Your client has relied on terms that are not contained in the contract to justify its behavior. ACC says that's wrong, it's not provided for in the contract. The district court looked at it and said, well, it's clear to me from reading the contract that Amgen is entitled to do that. But you can't point to any provision in the contract that makes that clear. Why should we not conclude that as a matter of law, the district court erred in granting a 12B motion to dismiss on this record? Because there are two things at issue. One is whether ACC met the condition, and second, how Amgen dealt with that if they did not meet the condition. But in order to determine the answer to that question, it seems to me the district court has to consider evidence outside of the contract. That creates an ambiguity as a matter of California contract law. If you're talking about the second question, that's not an issue. Because ACC is not saying, yes, we understand that we return the product, yes, we understand that that should be discounted, but we dispute the amount. They believe they should be able to retain all of those rebate checks. And when they returned in the subsequent quarter, that has zero effect on them because they were not purchasing the product. So they just believe they get to keep the rebates forever. We don't actually know exactly what they think or what we think, because we don't even know how the numbers were calculated. It looks to me as though we've got a hyper-technical question. We do not have words in the contracts, either one of them, the original or the amendment, that tell us the answer. Instead, what we have is an argument about what a reasonable interpretation is, but no words that say what the interpretation should be. We have two numbers up in the air, 37,000 and 184,000, and we don't know where they came from, really. I wonder why we don't have to remand it for such factual development or trial or summary judgment or whatever may get us some resolution. Well, I think, Your Honor, the contract interpretation at 12B6 is a legal question. The judge can make a determination that the contract here is not ambiguous. It looks to me like they were playing gangsmanship, but who knows what, you know, without a record. I mean, your interpretation seems to be a lot more reasonable. Otherwise, you know, they could, God knows how much they could claim and then get rebates. That's the thing, Your Honor, is that under their argument, they can return the product the next day after the contract. I understand that. That's a little confusing since you can't point to anything, and we don't understand really how this thing was working out in the real world. No, well, what I'm saying is you're right. The contract does not say if product is returned in a subsequent period, you go back to the original period. It does not lay that out explicitly. There's no doubt about that. Nor does the contract say that you have the right to offset disputed amounts from a prior contract in subsequent year contracts. The offset is more of an ongoing business relationship. I understand that, but that requires proof of evidence that is outside of the contract. One point I'd like to make, Your Honor, is that if you determine that ACC did not meet the condition present to achieve the rebate, that's enough to – I'm not sure. Because you're not allowed to – I don't see how – – enforce the contract against amnesty. Counsel, I don't see how I can make that determination on the basis of the record that is before me, because the contract is silent on what the effect is unless the return is made in the same quarter that the purchase occurred. Well, actually – That's the only thing I can – The vesting provision, Your Honors, in the contract itself, and I can point to that, it's on Supplemental Excerpt of Record 6, it says that provided the above conditions are met, then the payment vests. So the payment alone is not enough. My problem is – I guess my real problem is you won the case too soon. I think you're probably right. I think you're probably right, because it doesn't make a whole lot of sense, the doctor's interpretation. However, you've got this amendment that says we're amending the contract by providing new schedules. And then they take advantage of that. Oh, the return we wouldn't have made under the old schedule is worth making under the new schedule. I don't know if there's anything wrong with that. You interpret these things contra pro forentum, and boy, if it was summary judgment, the case would be a whole lot easier, because we'd have some affidavits and we'd actually have a calculation that gave us the arithmetic. And maybe a testimony about what a commercially reasonable practice would be? Well, Your Honor, again, if the challenge was on the calculation, that would be a different issue. But like I said, they are arguing that they get to keep all the rebates. It's not a dispute. They're arguing more than that. They're arguing not only that they get to keep all the big fat rebate check that you paid them, but they're also arguing that you're not entitled to offset $184,000 in new rebates from subsequently purchased product. But there's no dispute on the record about them having earned the new rebates. And whether... But you won't pay them. That's the dispute. Right. Because of the return they made on the old purchases. And of that, they claim they get all of it. They made them a product they bought during the old contract, but they didn't make them during the period of the old contract. And what they're saying is, if I understand it right, we agreed to Amgen's proposed amendment of the tiers, the schedule of how much you have to buy to be in what tier. And then once we had amended tiers and different numbers in the tiers, then we made a return. And that was under the provisions of the amended contract. Now, I'm skeptical, as I've indicated, but, boy, I don't know. I don't know if that's irrational. Well, Your Honor, obviously on 12b-6, the court is sitting by itself and it doesn't have a jury. It's deciding whether to make a legal interpretation of the contract. And here, it did. It believed that it was non-ambiguous. And I believe the reason it did on the record is because of the less credits and return Let's look at the language on page 6. You started to read, am I looking correctly, the section that is headed Payment Investing Section 8? Correct. Provided the above conditions are met and subject to the complete and actual terms and conditions outlined under the Group Purchasing Agreement, the Amgen portfolio rebates for participating eligible physician practices will be calculated and paid on a quarterly measurement period basis. Where is the Group Purchasing Agreement so that I can determine that the condition was met? Your Honor, the Group Purchasing Agreement is something that's incorporated in here and to which a few responses. One is, they should have a copy if it's a signatory decision. I should have a copy. I don't have a copy of the Group Purchasing Agreement, so I can't look. Understood, Your Honor, but they chose, as the plaintiff, they choose what goes into the complaint. Counsel, if you're saying to the court, all you have to do is interpret the contract, and I'm reading a provision in the contract that incorporates yet another document that is not before me, the Group Purchasing Agreement. We could offer that document if it's referenced in the complaint. And if it's not disputed, Your Honor, and so we focus on the record and what they had included in the record. There were no allegations about the DPO agreement in the complaint itself, and we focus on the record. Your Honor, if you focus on a 12b-6, you risk wasting all your money on a lot of meaningless appellate work. They were used to filing, so. Okay, soundly, I think we all, soundly their interpretation could lead to a lot of horsing around here, but reality is, we don't have the full picture that, well, at least I don't. I don't understand whether it was a screw-up in draftsmanship on your part or somebody else's part. Well, Your Honor, that would make it, you know, essentially bulletproof under 12b-6. I don't know if that's real, I think, really saw what was going on, but unfortunately the record isn't complete. I mean, he may have very well accurately predicted what the ultimate outcome of this lawsuit is going to be, but I just don't see how, as a matter of dismissal law under 12b-6, we can uphold what he did in the face of the gaps that we have in the contractual language and the course of conduct that you're urging us to accept. You mentioned the commercial reasonableness point earlier, and I do believe that the case will support that in determining, as a legal matter, whether the contract is ambiguous and the proper interpretation of that, that the court is allowed to make such an undertaking of commercial reasonableness. But from where? Because of what I think is commercially reasonable as a judge? I've got nothing in the record. Well, Justice, several of you have mentioned... ...how pharmaceutical companies and physicians behave interstitially. Sure. Just by the questions that you had asked the ACC about, well, could they then return the product the second after they received the rebate check? Under their argument, yes, right? And that's not commercially reasonable. That's not a commercially reasonable interpretation of this contract. I don't think they'd have much to stand on if it weren't for the amendment. But when you have, when you send a letter that both parties sign off on saying the schedules are amended... It amends the schedules, Your Honor, but it doesn't amend any of the less credits and returns language. And if I understood ACC's argument, it's just the point that they were making is the products, when they made the returns, in 2004, at that point in, I'm sorry, in 2006, at that point in 2006, they were under a different contract, but that has nothing to do with when the products were purchased. But then you don't answer the question that if they're going with a competitor, why, and you're right, what they should have done is just use up all the rest of it, and then they would... That's correct. And that's what they should have done, because what happens, Your Honor, is that when you factor in the returns, okay, they essentially got the best price that any customer agent had, okay? And Amgen then has to offer that to all of the Medicaid customers under the rules. And so that's why those returns had to be credited in the... But they shouldn't have sent it back, right? They shouldn't have. They should have used it in due course. In due course with the patients they have, which they would need to use. It's not like they stopped buying these products. They are buying them. Yeah, but they should just have used it up and not made a claim for return, and they'd keep all the money. Correct. And that would not have changed... In due course. Correct. And that wouldn't have changed the effective price that Amgen had essentially given to them. By their returns, it changed the effective price that Amgen had given to them. I guess we've gone way over time, because the case is complicated and difficult to understand with the present state of the record, and I guess I ought to adjourn unless my colleagues have more questions. I think not. Thank you, counsel. Thank you, counsel.  All rise. The Atlanta Cancer v. Amgen is submitted for adjournment for the day. Thank you. Thank you.
judges: Trager, Kleinfeld, Tallman